E-FILED
Friday, 24 March, 2023  02:28:08 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| HOSPITAL SISTERS HEALTH SYSTEM, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 3:20-cv-1295 |
| GREAT AMERICAN INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge.**

This cause is before the Court on the Motion for Summary Judgment (d/e 32) and a Memorandum in Support thereof (d/e 34) filed by Defendant Great American Insurance Company.  For the reasons set forth below, Defendant's Motion (d/e 32) is DENIED.

## I. PROCEDURAL BACKGROUND

Plaintiff Hospital Sisters Health System ("HSHS") originally filed this suit in August 2020 against Great American Insurance Company ("Great American").  Plaintiff brings state law claims against Defendant for breach of contract (Count I), declaratory

relief (Count II), and extra-contractual relief (Count III). <u>See</u>
Compl. (d/e 1). Defendant Great American filed an Answer,
Affirmative Defenses, and Counterclaim (d/e 6) to Plaintiff HSHS'
Complaint on October 20, 2020. In turn, Plaintiff HSHS filed its
Answer to Defendant Great American's Counterclaim (d/e 9) on
November 10, 2020. On March 15, 2022, Defendant Great
American moved for summary judgment pursuant to Rule 56 of
the Federal Rules of Civil Procedure against HSHS (d/e 32) on all
Counts.

## II. FACTS

The Court draws the following facts from the parties'
statements of undisputed material facts. The Court discusses any
material factual disputes in its analysis. Immaterial facts or
factual disputes are omitted. Any fact submitted not supported by
a citation to evidence will not be considered by the Court. Civil LR
7.1(D)(1)(b) & (2)(b)(2). Any fact response that is unsupported by
evidentiary documentation is deemed admitted. <u>Id.</u>

### A. The parties and the Policy.

Hospital Sisters Health System ("HSHS") is a 501(c)(3) non-
profit corporation organized under Illinois law, with its principal

place of business in Springfield, Illinois.  Defendant Great

American Insurance Company ("Great American") is an Ohio

insurance corporation doing business in Illinois.

On or about February 28, 2017, Great American issued a

Crime Protection Policy numbered SAA 0307498 05 00 (the "2017-

2018 Policy") to HSHS with an effective period of July 1, 2017 to

July 1, 2018.  See Compl. Ex. A (d/e 1-1).  Great American had

issued prior policies to HSHS which were in effect from July 1,

2015 to July 1, 2016 (the "2015-2016 Policy") and from July 1,

2016 to July 1, 2017 (the "2016-2017 Policy").  See MSJ, Ex. 126,

127 (d/e 34).  Each preceding policy was cancelled by mutual

agreement of the parties upon inception of the new, succeeding

policy.  Id. at Ex. 126 at p. 3; Ex. 127 at p. 3.

The 2017-2018 Policy provides HSHS insurance coverage

pursuant to several Insuring Agreements.  Id. Compl. Ex. A, p. 11–

12.  Insuring Agreement 1, which was revised by Endorsement No.

8, provides coverage for "Employee Dishonesty."  See id. at 11, 44.

The modified Insuring Agreement 1 provides that Great American

"will pay for loss resulting directly from employee dishonesty."  Id.

at 44.  "Employee dishonesty" means "only theft by an employee,

whether identified or not, acting alone or in collusion with other persons, except you or a partner." Id.  Theft is defined as "the unlawful taking of money, securities and other property to the deprivation of the Insured." Id.

The 2017-2018 Policy contained several exclusions from coverage. Id. at 15–18.  Under Insuring Agreement 1, the 2017-2018 Policy states that Great American will not pay for "loss caused by an employee of [HSHS], or predecessor in interest of [HSHS], for whom similar prior insurance has been canceled and not reinstated since the last such cancellation." Id. at 16.

The 2017-2018 Policy also contained several conditions to its insurance coverage. Id. at 18–25.  Condition E.6 is applicable to all Insuring Agreements and defines "Discovery of Loss" as occurring "when [HSHS] first become[s] aware of facts which would cause a reasonable person to assume that a loss covered by this Policy has been or will be incurred, even though the exact amount or details of the loss may not then be known." Id. at 19.  Condition E.7, as modified by Endorsement No. 5, is also applicable to all Insuring Agreements and provides that:

[a]fter The Risk Management Department and/or Corporate Legal Department and/or Officer discover(s) a loss or a situation that may result in a loss The Risk Management Department and/or Corporate Legal Department and/or Officer must:

a. Notify [Great American] as soon as possible;

b. Submit to examination under oath at [Great American's] request and give [Great American] a signed statement of your answers;

c. Give [Great American] a detailed, sworn proof of loss within 120 days; and

d. Cooperate with [Great American] in the investigation and settlement of any claim.

Id. at 19, 40.

Condition E.11 is also applicable to all Insuring Agreements and provides that

[HSHS] may not bring any legal action against [Great American] involving loss:

a. Unless [HSHS] ha[s] complied with all the terms of this Policy; and

b. Until 90 days after [HSHS] ha[s] filed proof of loss with us; and

c. Unless brought within 2 years from the date you discover the loss.

Id. at 21.

### B. The incident and Underlying Action.

From November 2012 to October 2015, Jeffrey Ogletree held the position of HSHS' Vice President of Revenue Cycle.  <u>See</u> Compl. (d/e 1) at ¶ 17.  In November 2013, Ogletree introduced HSHS to Free Choice Healthcare Foundation ("Free Choice") and its representatives, Brian LaPorte and Enrique Moreno.  <u>Id.</u> at ¶ 21.  On December 1, 2013, HSHS and Free Choice entered into a contract providing that Free Choice would purchase health insurance policies for indigent patients of HSHS in exchange for 30% of any payments made under the policies for services provided by HSHS to the relevant patients.  <u>See</u> MSJ, Ex. 100 (d/e 34).

On January 8, 2015, Daniel McCormack, Vice President of Philanthropy for HSHS of St. Francis Foundation ("HSHS Foundation") notified the HSHS Foundation's Board of Directors of a special meeting to be held on January 12, 2015, to consider a request that the HSHS Foundation pay $5,161,500 to fund a program in which Free Choice would purchase health insurance policies for 333 patients.  Ex. 102.  McCormack's email stated that the patients for whom insurance policies would be purchased had a total of 2,908 medical visits to HSHS' facilities in 2014 resulting in "nearly $14 million" in charges for which HSHS was not paid.

Id.  These figures were obtained from Ogletree and were pertinent to HSHS' decision to enter into a contract with Free Choice.  Ex. B at 24:25-25:18; 26:1-15.

On January 13, 2015, HSHS and Free Choice amended the prior contract to provide that HSHS would "contribute" $15,500 to Free Choice for each one-year policy Free Choice purchased.  Ex. 100.  McCormack approved a disbursement of $5,161,500 from the HSHS Foundation to Free Choice pursuant to the amended contract.  Ex. B at 23:25-24:11.

Mark Novak served as HSHS' Vice President System Responsibility Officer during the relevant time period.  Ex. A at 9:5-10:15; Ex. 25.  Novak reported directly to both HSHS' President and Chief Executive Officer (CEO), Mary Starmann-Harrison, and the Audit and Integrity Committee of HSHS' Board of Directors.  Ex. C at 10:13-23, 11:21-13:6; Ex. 26 at 5; Ex. 25; Ex. A at 11:13-12:1.  Novak attended all meetings of the Audit and Integrity Committee and was authorized to access its Board of Directors directly "without the approval of the CEO."  Ex. 26 at 5; Ex. C at 12:20-25, 13:1-6.

On November 11, 2014, an employee reported concerns to Novak about connections between Ogletree and several vendors, including Free Choice and iSis Healthcare ("iSis").  Ex. 28; Ex. 29. On November 25, 2014, Novak issued a written report to HSHS' Chief Financial Officer (CFO) Michael Cottrell confirming that Free Choice and iSis shared the same IP address and were managed by the same individuals, and that the telephone number listed in an invoice issued by iSis belonged to Ogletree's wife.  Ex. 29; Ex. A at 14:8-19, 17:5-18, 18:3-9.  Ogletree admitted that his wife's telephone number appeared on the invoice because he had allowed iSis to use his personal accounting software subscription.  Ex. A at 14:22-16:1; Ex. 29.

In June 2015, Novak hired Global Edge, LLC ("Global Edge") to investigate potential conflicts of interest between Ogletree and certain vendors, including Free Choice.  Ex. 30; Ex. A at 22:7-24:5. Novak testified that HSHS decided to investigate Ogletree "due to a previous theft by an employee who started a corporation and was stealing money and so I said, well, I just thought about this because this is during the time I was suspecting some

involvement" between Ogletree and Free Choice.  Ex. A at 22:25-23:17.

From 2011 to October 2016, Michael Sowinski worked for Catholic Healthcare Audit Network ("CHAN"), which performed internal audit functions for HSHS.  Ex. D at 10:18-11:14, 17:1-4. Sowinski's only client was HSHS, and he had an office on site and worked "with all senior leadership" during the relevant time.  Id. at 12:2-11, 13:12-14:13.

On July 31, 2015, Sowinski told Novak that the average monthly cost for a sample of the Free Choice health insurance policies was $516.38, which meant "[Free Choice] [wa]s keeping around $3.0 million of the $5.2 million you paid them when you extrapolate across all patients and for 12 months."  Ex. 32; Ex. D at 27:1-28:19.  Novak was "concern[ed]" that Free Choice would retain approximately $3 million and reported this information to HSHS' CEO Starmann-Harrisson, CFO Cottrell, and HSHS' General Counsel.  Ex. A at 35:7-36:25.  Sowinski also found that Ogletree "wasn't honest" and "was misrepresenting the truth to the board" because he had "padded" the data that the HSHS Foundation Board and McCormack relied on in approving the

contract such that the anticipated return on investment was inflated by "three or four times" the amount the real data supported.  Ex. D at 45:22-47:13.

Novak, Cottrell, and the Board of Directors received copies of Sowinski's report ("the CHAN Report"), which states that the rate paid to Free Choice was "excessive" and that Ogletree had claimed the rate paid to Free Choice "came from Free Choice and [] was accepted without question."  Ex. 36 at 2.  Starmann-Harrison testified that she was aware of the CHAN audit at the time it occurred and reviewed a summary of the CHAN report.  Ex. C at 21:1-4, 23:7-16, 38:17-20.  The CHAN Report states that the rate paid to Free Choice was "excessive and results in an estimated $3.1 million retention fee (61%) of the contributed $5.2 million paid to Free Choice under a best case scenario."  Ex. 36 at 2 (emphasis in original).  The CHAN Report indicates that Ogletree had claimed the rate paid to Free Choice "came from Free Choice and it was accepted without question."  Id.

On October 16, 2015, Sowinski sent a summary of his findings to Novak and HSHS' General Counsel, Amy Marquardt, which indicated among other things, that Ogletree had inflated the

data that was presented to the HSHS Foundation Board.  Ex. 40.

On or around December 8, 2015, Sowinski discovered files in

Ogletree's computer demonstrating that Ogletree had lied about

his involvement in setting the rate paid to Free Choice.  Ex. 41.

On December 8, 2015, Novak told Cottrell, Starmann-

Harrison, and Marquardt that Ogletree had lied about his

involvement in determining the rate paid to Free Choice.  Ex. 42;

Ex. A at 85:4-16.

On February 1, 2016, Novak sent an email to Sowinski and

Marquardt with additional evidence that Ogletree had lied about

his involvement in determining the rate paid to Free Choice.  Ex.

43; Ex. D at 76:13-77:18.

On January 8, 2016, Sowinski forwarded a December 8, 2015

email to Novak which states that Ogletree "could be found guilty"

for helping Free Choice commit fraud.  Ex. 41.

On February 2, 2016, Sowinski sent an email to Novak and

Marquardt which again stated his belief that Ogletree committed

fraud.  Ex. 43.  He expressed this belief to Novak and Marquardt

again on February 4, 2016.  Ex. 44.  Sowinski also told Starmann-

Harrison in 2015 or 2016 that "Ogletree may have been the setup

man for a fraud involving Free Choice." Ex. C at 45:15-23. Novak also testified that he was "concerned" as of February 4, 2016, that Ogletree "may have priced a windfall in the rate that was being paid to Free Choice in order to set up a fraud[.]" Ex. A at 83:17-85:16.

In or around February 2016, Marquardt retained McDermott Will & Emory, LLP ("McDermott") to assist with the Free Choice matter. Ex. F at 64:13-23. On February 18, 2016, McDermott recommended to Marquardt and Novak that HSHS report its suspicions to the Illinois Attorney General Charitable Trust Bureau if it "remained unsatisfied that the money [paid to Free Choice] went to charitable purposes" after exhausting efforts to confirm the use of the funds. Ex. 46. HSHS decided to proceed with reporting Free Choice to the Illinois Attorney General on or before July 14, 2016. Ex. A at 93:18-24.

On January 14, 2017, Bulpitt authorized McDermott to investigate whether "FreeChoice/Brian La Porta/Jeff Ogletree have sufficient assets to cover any judgment a court may award to [HSHS] if it is successful in litigation." Ex. 58. On January 16,

2017, Bulpitt informed Starmann-Harrison and Cottrell that McDermott had engaged a private investigator.  Ex. 59.

On August 24, 2017, Paul Libassi, an investigator in the Office of the District Attorney for Riverside, California, sent a letter to Starmann-Harrison stating that HSHS "may have donated several millions to a California charity which is being used as a vehicle to commit fraud."  Ex. 62.

Starmann-Harrison delegated the matter to Novak.  On or about September 5, 2017, Novak discussed Ogletree's involvement with Free Choice with Libassi, who told Novak that he believed Ogletree had used HSHS' funds to purchase a house in Idaho.  Ex. A at 102:8-103:5, 105:5-25.  Starmann-Harrison and Cottrell received Novak's September 5, 2017 e-mail stating that Ogletree was "up to his neck in this" and was an authorized signer for Free Choice's bank account.  Ex. 69.

Novak testified that as of September 8, 2017, he had received information from Libassi "justifying that there was evidence of fraud, yes."  Ex. A at 111:7-12.

Cottrell testified that he knew as of September 15, 2017, that there was a plan to charge Ogletree with theft.  Ex. E at 78:2-7.

Novak testified that as of September 15, 2017, he had no doubt Ogeltree's home was purchased with HSHS' funds.  Ex. A at 115:17-116.:3.

HSHS first notified Great American of the alleged loss at issue in this case on April 25, 2018.  Pl. Answer to Councerclaim at ¶ 11.  On August 20, 2019, Great American agreed that "a suit filed on or before June 1, 2020 will be treated as if received on August 20, 2019."  MSJ, Ex. 12.  HSHS filed its complaint on August 17, 2020.

### III. JURISDICTION

The Court has diversity jurisdiction.  See 28 U.S.C. § 1332(a)(1) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States . . . "). Plaintiff HSHS has its principal place of business in Illinois and is incorporated under the laws of Illinois.  Complaint, d/e 1, p. 2.  Defendant Great American has its principal place of business in Ohio and is incorporated under the laws of Ohio.  Id.  The amount in controversy exceeds $75,000.  Id. Venue is proper because Defendant does business in this district

and a substantial part of the events or omissions giving rise to

Plaintiff's claims occurred in this district.  28 U.S.C. § 1391(b)(1),

(b)(2).

## IV. LEGAL STANDARD

Summary judgment is proper if the movant shows that no

genuine dispute exists as to any material fact and that the movant

is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

The movant bears the initial responsibility of informing the court of

the basis for the motion and identifying the evidence the movant

believes demonstrates the absence of a genuine issue of material

fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A

genuine dispute of material fact exists if a reasonable trier of fact

could find in favor of the nonmoving party.  Carroll v. Lynch, 698

F.3d 561, 564 (7th Cir. 2012).  When ruling on a motion for

summary judgment, the court must consider the facts in the light

most favorable to the nonmoving party, drawing all reasonable

inferences in the nonmoving party's favor.  Egan Marine Corp. v.

Great Am. Ins. Co. of New York, 665 F.3d 800, 811 (7th Cir. 2011).

## V. ANALYSIS

As an initial matter, in a diversity case, the Court applies state law to substantive issues.  <u>RLI Ins. Co. v. Conseco, Inc.</u>, 543 F.3d 384, 390 (7th Cir. 2008).  When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits.  <u>See</u> <u>Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co.</u>, 712 F.3d 336, 341 (7th Cir. 2013).  Here, the parties have not raised a conflict of law issue and have instead largely briefed the issues on the merits under Illinois law.  As a result, the Court will apply the law of Illinois.

### A. Defendant Great American Is Not Entitled to Summary Judgment on Counts I and II on the Grounds That the Complaint is Time-Barred Because the Tolling Agreements Are Ambiguous.

Under Illinois law, courts must attempt to effectuate the parties' intent when interpreting a contract.  <u>Gallagher v. Lenart</u>, 874 N.E.2d 43, 43 (Ill. 2007).  Courts interpret contracts by first looking at the language of the contract alone.  <u>Air Safety, Inc. v. Teachers Realty Corp.</u>, 706 N.E.2d 882, 884 (Ill. 1999).  "Interpreting a contract requires an examination of the complete document and not an isolated part or parts."  <u>Young v. Allstate Ins. Co.</u>, 812 N.E.2d 741, 748 (Ill. App. Ct. 2004).  "If the language of

the contract is clear and unambiguous, [courts] interpret the contract without the use of parol evidence and contract terms are interpreted according to their plain meaning unless otherwise defined." Camico Mut. Ins. Co. v. Citizens Bank, 474 F.3d 989, 993 (7th Cir. 2007).  If the contract's language is susceptible of more than one interpretation, an ambiguity exists, and parol evidence is admissible to determine the intent of the parties.  Air Safety, 706 N.E.2d at 884.  Where the intent of the parties may be ascertained from the plain language of the extrinsic evidence, no disputed question of fact exists.  Ebert v. Dr. Scholl's Foot Comfort Shops, 484 N.E.2d 1178, 1184 (Ill. App. Ct. 1985).

The 2017-2018 Policy provides that HSHS "may not bring legal action . . . [u]nless brought within 2 years from the date [HSHS] discover[ed] the loss."  MSJ (d/e 34), Ex. 23 at § E.11. However, Great American and HSHS subsequently entered into an agreement to toll the limitations period: "This note confirms that a suit filed on or before June 1, 2020 will be treated as if received on August 20, 2019. All requests for further suit extensions must be submitted in writing. All rights and defenses remain respectfully reserved, under the policy, at law and equity."  d/e 34, Ex. 17.

Great American then agreed to a second tolling agreement: "This note confirms that a suit filed on or before September 1, 2020 will be treated as if received on April 1, 2020. All requests for further suit extensions must be submitted in writing. All rights and defenses remain respectfully reserved, under the policy, at law and equity." Id.  The parties do not dispute the validity of these two tolling agreements, or that the suit was filed on August 17, 2020. However, the parties disagree on how these tolling agreements should be interpreted.

Great American argues that the first tolling agreement became moot because HSHS did not file a complaint on or before June 1, 2020, and that HSHS' August 17, 2020 Complaint should be treated as if it were filed on April 1, 2020.   On the other hand, HSHS argues that its complaint should be treated as if it were filed on August 20, 2019.  If Great American's interpretation controls, the Complaint would be barred if HSHS discovered the loss before April 1, 2018.  If HSHS' interpretation controls, the Complaint would be barred if HSHS discovered the loss before August 20, 2017.  HSHS maintains that it discovered the loss on March 8, 2018.  See d/e 34, Ex. 4.  In other words, the dispute boils down

to whether the first tolling agreement expired on June 1, 2020 or if it was still in effect upon the filing of the complaint on August 17, 2020.

HSHS puts forth several arguments in support of its interpretation. First, HSHS argues that the parties did not intend such an "absurd result." d/e 39, p. 21. HSHS contends that Great American's interpretation of the second tolling agreement only gave HSHS until April 1, 2020, a date prior to the expiration date of the first extension, to file suit. HSHS also argues the fact that Great American's interpretation ignores that Great American did not deny coverage until April 27, 2020 and thus could not reasonably have expected the date for filing suit to be April 1, 2020.

The Court does not find that Great American's interpretation of the tolling agreement leads to an absurd result. "Courts will construe a contract reasonably to avoid absurd results." Suburban Auto Rebuilders, Inc. v. Ass'n Tile Dealers Warehouse, Inc., 902 N.E.2d 1178, 1190 (Ill. App. Ct. 2009). The purpose of the two tolling agreements was to extend the time that HSHS could file its Complaint, presumably so that HSHS could bring forth a

valid claim within the limitations period.  Great American's interpretation of the tolling agreements did not require HSHS to file its Complaint by April 1, 2020; rather, if HSHS had filed suit between April 1, 2020, and June 1, 2020, the Complaint would have been treated as if it had been received on August 20, 2019. However, because HSHS chose to file suit on August 17, 2020, Great American contends that it should be treated as if it were filed on April 1, 2020.  While Great American's denial of coverage occurred on April 27, 2020, HSHS had over a month to file its complaint and still have it treated as filed on August 20, 2019.

Second, HSHS asserts that Great American's conduct equitably estops it from enforcing the 2017-2018 Policy's contractual limitation period.  To establish equitable estoppel, the party claiming estoppel must demonstrate that:

> (1) the other party misrepresented or concealed material facts; (2) the other party knew at the time the representations were made that the representations were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other party intended or reasonably expected the representations to be acted upon by the party claiming estoppel or by the public generally; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her

detriment; and (6) the party claiming estoppel has been prejudiced by his or her reliance on the representations.

In re Scarlett Z.-D., 28 N.E.3d 776, 784–85 (Ill. 2015).  The party claiming equitable estoppel has the burden of proving it by clear and convincing evidence." Id. at 784.  Whether estoppel exists is a case-specific determination. Sponemann v. Country Mut. Ins. Co., 457 N.E.2d 1031, 1038 (Ill. App. Ct. 1983).

However, equitable estoppel is not appropriate here.  HSHS argues that it reasonably relied on Great American's confirmation that HSHS could delay filing suit.  In the insurance context, "[a]n insurance company may be estopped from raising a limitations defense by conduct which induces in its insured a reasonable belief that his claim will be settled without suit." Sponemann, 457 N.E.2d at 1038.  "[E]stoppel may be found where negotiations are such as to lull the insured into a false security, thereby causing him to delay the assertion of his rights." Id.; see Foamcraft, Inc. v. First State Ins. Co., 606 N.E.2d 537, 540 (Ill. App. Ct. 1992) ("Cases in which an insurer's conduct is found to amount to estoppel typically involve . . . statements by the insurer which encourage the plaintiff to delay filing his action.").  However, the

"mere pendency of negotiations conducted in good faith is insufficient to give rise to estoppel." <u>Sweis v. Founders Ins. Co.</u>, 98 N.E.3d 485, 499 (Ill. App. Ct. 2017) (citations omitted).

HSHS has not pointed out any facts that indicate that a reasonable person would believe negotiations were taking place or that the instant suit would be settled. Additionally, Great American explicitly denied coverage on April 27, 2020. HSHS had a month to file its complaint so that it would be treated as filed on August 20, 2019. <u>See</u> <u>Doll v. Farmers Auto. Ins. Ass'n</u>, 370 N.E.2d 258, 261 (1977) (refusing to estop insurer who denied the insured's claim two weeks prior to the expiration of the contractual limitation period). HSHS has not demonstrated that it needed more than one month to file suit. Moreover, Great American had cooperated with HSHS' requests for two tolling agreements, both of which benefitted HSHS.

Third, HSHS argues that Great American's contractual limitations period defense is "late-concocted." Response (d/e 39), p. 22. The Court disagrees. Great American's contractual limitations period defense is presented in Great American's Answer as an affirmative defense. <u>See</u> d/e 6, p. 8.

However, contrary to Great American's argument that the tolling agreement is unambiguous, the Court finds ambiguity in the language of the tolling agreements. When interpreting a contract, the words used are given their plain and ordinary meaning.  Young, 812 N.E.2d at 748.  Moreover, the court examines the entire document.  Id.  In requesting the second tolling agreement, HSHS used the language "**additional extension** of the time period for bringing a legal action under the crime policy. Please **confirm** per our discussion that [Great American] agrees to toll the time period for bringing a legal action until September 1, 2020 and that any legal action [HSHS] may bring against [Great American] on or before September 1, 2020 concerning this claim and the Crime Policy will be deemed to have been brought on the date of the Insured's original request, **August 20, 2019**."  d/e 34, Ex. 17 (emphasis added).  In response, Great American "confirm[ed] that a suit filed on or before September 1, 2020 will be treated as if received on **April 1, 2020**" and stated "[a]ll requests for **further** suit **extensions** must be submitted in writing.  Id. (emphasis added).  Although HSHS requested that a complaint filed on or before September 1, 2020 would be treated as

if it were filed on August 20, 2019, Great American confirmed that it would be treated as if received on April 1, 2020.  There is a clear conflict in the parties' intent, which creates ambiguity.

Further, when construing all facts in the light most favorable to HSHS and drawing all reasonable inferences in HSHS' favor, the plain language definition of the words "extension," "further," and "additional" supports HSHS' interpretation that the second tolling agreement allows for its complaint to be treated as if it were filed on August 20, 2019.  The Merriam-Webster Dictionary defines "extension" as "an increase in length of time."  Extension, MERRIAM-WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/extension (last accessed February 27, 2023).  Black's Law Dictionary defines extension as "[t]he continuation of the same contract for a specified period."  Extension, BLACK'S LAW DICTIONARY (11th ed. 2019).  The Merriam-Webster Dictionary defines "additional" as "more than is usual or expected: added."  Additional, MERRIAM-WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/additional (last accessed February 27, 2023).  Added is defined as "existing or occurring as an increase or

addition."  Added, MERRIAM-WEBSTER DICTIONARY,

http://wwww.merriam-webster.com/dictionary/added (last

accessed February 27, 2023).  The Merriam-Webster Dictionary

defines "further" as "to a greater degree or extent" and "in

addition."  Further, MERRIAM-WEBSTER DICTIONARY,

http://www.merriam-webster.com/dictionary/further (last

accessed February 27, 2023).  The ordinary meaning of these

words indicate that a reasonable jury may find that HSHS's

interpretation of the second tolling agreement is reasonable.

Moreover, Great American's confirmation of the second tolling

agreement read in the context of HSHS' request suggests that

HSHS was reasonable in believing that the second tolling

agreement would treat the complaint as if it were filed August 20,

2019.  Since two reasonable interpretations of the tolling

agreements exist, the contract is ambiguous.  As a result, Sigelko's

declaration is admissible as parol evidence on the intent of the

parties because ambiguity exists.  Pl.'s Ex. 1.  In her declaration,

Sigelko states: "Based on my conversations with Tim Markey and

our email exchanges, I understood that the effective date of any

complaint filed by September 1, 2020 would be August 20, 2019—

well within the two-year contractual limitations period." Id. at ¶ 13.  Sigelko's statements indicate that HSHS intended the second tolling agreement to treat a complaint filed on or before September 1, 2020 to be treated as if received on August 20, 2019.

There is a genuine dispute of material fact regarding the ambiguity of the tolling agreements.  Therefore, Defendants' Motion for Summary Judgment is DENIED with respect to the claim that HSHS' Complaint is time-barred.  Great American asserts that HSHS actually discovered the loss prior to July 1, 2017 and as a result, HSHS' Complaint would still be time-barred even if the Court treats the Complaint as having been filed on August 20, 2019.  However, as the Court analyzes below, a reasonable jury could find that discovery did not occur until March 8, 2018.

**B. Defendant Great American Is Not Entitled to Summary Judgment on Counts I and II Because the Employee-Specific Cancellation Condition Does Not Exclude Coverage for Loss Caused by Ogletree.**

**1. Defendant Great American May Rely on the Employee-Specific Cancellation Condition.**

First, HSHS argues that Great American's employee-specific cancellation condition does not apply because the thefts occurred before HSHS allegedly discovered Ogletree's dishonesty in

September 2015.  HSHS contends that the employee-specific cancellation condition cannot be retroactively applied, and that such an interpretation would render coverage illusory because an insured could not report a loss until after it becomes aware its employee has engaged in dishonest acts.

A court will decline to adopt an interpretation of a policy that renders coverage illusory.  Ill. Farmers Ins. Co. v. Keyser, 956 N.E.2d 575, 578 (Ill. App. Ct. 2011).  However, Great American's interpretation of the 2017-2018 Policy is not illusory.  Here, there are two provisions interacting with each other.  The first is the automatic cancellation provision, which states that coverage is "cancelled as to any employee . . . immediately upon discovery" by "(1) you; or (2) any of your partners, officers or directors not in collusion with the employee . . . of any dishonest act committed by that employee . . . provided that such conduct involved loss of money, securities or other property valued at $25,000 or more."  MSJ, Ex. 23 at Endorsement No. 3; Ex. 126 at Endorsement No. 3; Ex. 127 at Endorsement No. 3.  This type of provision is "well recognized as being reasonable; to conclude otherwise would be contrary to fundamental fairness and public policy—the [insured]

should not be compensated for losses caused by the misconduct of its employees of which it was aware and did nothing to prevent." Kinzer ex rel. City of Chicago v. Fid. & Deposit Co. of Md., 652 N.E.2d 20, 27 (Ill. App. Ct. 1995).  The second provision is the employee-specific cancellation condition, which excludes loss "caused by any employee of [HSHS], or predecessor in interest of [HSHS], for whom similar prior insurance has been cancelled and not reinstated since the last such cancellation."

Great American asserts that the insurance claim is subject to the employee-specific cancellation provision in the 2017-2018 Policy that excludes loss because an automatic cancellation provision in a prior policy was triggered when HSHS learned, at the latest, by July 14, 2016, that Ogletree had committed dishonest acts involving a loss exceeding $25,000, and failed to report its knowledge of the dishonest acts to Great American.  MSJ, Ex. 23 p. 5.

But, HSHS reads the employee-specific cancellation condition in isolation.  The employee-specific cancellation condition is not being applied retroactively; rather, if the automatic cancellation provision applies to Ogletree, the provision triggers the employee-

specific cancellation condition in subsequent policies to exclude coverage for loss caused by Ogletree.

### 2. Novak and Sowinski's Knowledge Could Trigger the Automatic Cancellation Provision.

The Court must determine whether, and when, the automatic cancellation provision was triggered.  If the automatic cancellation provision was triggered prior to the inception of the 2017-2018 Policy, the 2017-2018 Policy excludes the loss caused by Ogletree through the employee-specific cancellation provision.  In arguing that HSHS knew by July 14, 2016, of Ogletree's dishonest actions, Great American asserts the following: (1) Sowinski's audit in 2015; (2) Novak's admittance to knowledge in 2015 and 2016; and (3) a memorandum sent by Novak to Marquardt on July 14, 2016, concluding that Free Choice could not account for $1,532,609.06. The Court must first address whose knowledge could potentially trigger the automatic cancellation provision.  The Court notes that this discussion is distinct from whether the knowledge constitutes discovery such that it *actually* triggers the automatic cancellation provisions.

The parties disagree whether the knowledge of Sowinski and Novak could trigger the automatic cancellation provision.  The automatic cancellation provision requires discovery by "you" or "any of your partners, officers or directors[.]"  MSJ, Ex. 23 at Endorsement No. 3.  Under Illinois law, "[a]ll the provisions of the insurance contract, rather than an isolated part, should be read together to interpret it," U.S. Fire Ins. Co. v. Schnackenberg, 429 N.E.2d 1203, 1205 (1981), and "meaning and effect must be given to every part of the contract including all its terms and provisions, so no part is rendered meaningless or surplusage unless absolutely necessary."  Coles-Moultrie Elec. Co-op. v. City of Sullivan, 709 N.E.2d 249, 253 (1999) (citation omitted).  Applying the rule against surplusage, the Court finds that discovery by "you" and "any of your partners, officers or directors" hold different meanings.  Under Illinois law, corporations are artificial legal entities and the only knowledge which a corporation can be said to have is the knowledge which is imputed to it under principles of agency law.  Campen v. Executive House Hotel, Inc., 434 N.E.2d 511, 517 (Ill. App. Ct. 1982).  An agent's knowledge obtained while acting within the scope of his agency is imputed to the corporation

Page **30** of **54**

if the knowledge concerns a matter within the scope of the agent's authority.  Id.  Here, because HSHS is a corporation, "you" refers to knowledge held by HSHS and its agents.

HSHS argues that because Sowinski was an employee of CHAN, not HSHS, his knowledge does not trigger the cancellation provision.  While Sowinski was officially employed by CHAN, Sowinski's sole client was HSHS, he had an office at HSHS, and worked "with all senior leadership" during the relevant time.  Id. at 12:2-11, 13:12-14:13.  Sowinski's knowledge regarding Ogletree's dishonesty was obtained as a result of Sowinski's 2015 audit of HSHS' contract with Free Choice.  The scope of Sowinski's job entailed conducting internal audit functions for HSHS.  As a result, his knowledge was obtained while he was acting within the scope of his authority and in reference to a matter over which his authority extended, such that his knowledge is imputed to HSHS. Sowinski's knowledge regarding Ogletree's dishonesty was gained while conducting duties within the scope of his agency.  Campen, 434 N.E.2d at 517.  While Sowinski is not a "partner, officer or director" of HSHS, Sowinski's knowledge is attributable to HSHS

under agency law, and his knowledge comports with the automatic cancellation provision.

The Court also finds that Novak's knowledge of Ogletree's dishonesty can be imputed to HSHS.  HSHS did not identify Novak as an "officer" in its answer to Great American's Interrogatory No. 16, which asked HSHS to identify its "Officer[s]" as that term is used in Endorsement No. 5 to the Policy between July 1, 2015, and March 8, 2018.  d/e 39, Ex. 18.  However, even if an employee is not formally elected, he can be a *de facto* officer if he "exercised certain powers of an officer or agent with the approval and recognition of the corporation."  <u>Superior Envtl. Corp. v. Mangan</u>, 247 F. Supp. 2d 1001, 1002 (N.D. Ill. 2003) (applying Illinois law). Here, as HSHS' "Vice President, System Responsibility Officer," Novak was responsible for regulatory and statutory compliance. He reported directly to the CEO and was expressly authorized to access the Board of Directors without the approval of the CEO. Given Novak's title and responsibilities, although he was not a "formally-elected corporate officer," he was a *de facto* officer and any knowledge of Ogletree's dishonesty could trigger the automatic cancellation provision.

### 3. Whether HSHS Discovered Ogletree's Dishonest Acts in 2015 is a Question of Fact for the Jury.

Next, the Court must consider whether the knowledge of Novak, Ogletree, Marquardt, Cottrell, and Starmann-Harrison constitute discovery of dishonest facts such that it actually triggers the automatic cancellation provision. The automatic cancellation provision pertains to "discovery" of "dishonest acts," which is broader in scope than what is needed to trigger "discovery of loss" under Insuring Agreement 1, which only pertains to employee theft. Unlike the defined term "discovery of loss," with respect to Insuring Agreement 1, "discovery" and "dishonest acts" are undefined terms in the 2017-2018 Policy.

First, the Court examines what constitutes "dishonest acts." Whether an act is dishonest, or whether reasonable persons should have perceived an act to be dishonest, is generally for the jury. Cent. Nat. Life Ins. Co. v. Fidelity & Deposit Co. of Md., 626 F.2d 538, 541 (7th Cir. 1980) (reversing grant of summary judgment in favor of fidelity insurer when applying Illinois law because when reasonable persons could disagree as to the inferences to be drawn from the underlying facts, the issue of when

the loss resulting from dishonest or fraudulent acts was discovered is a question for the trier of fact).  In <u>Central Nat. Life</u>, the Seventh Circuit applied Illinois law in examining an insurance provision that provided coverage for losses resulting from employees' "fraudulent or dishonest acts."  <u>Id.</u> at 541.  The word "dishonest" is given a broad meaning, although "mere negligence, mistake, or error in judgment would not ordinarily be considered a dishonest act." <u>Id.</u> at 541–42.

Here, the dishonest acts in question are Ogletree's alleged purposeful inflation of data and alleged lie about his involvement in setting an excessive rate for Free Choice.  If reasonable persons could differ on whether the knowledge possessed could be construed as "negligence, a mistake, or incompetence," then the matter is a question for the jury.  <u>Cent. Nat. Life</u>, 626 F.2d at 542.  However, HSHS appears to concede that Ogletree's conduct would be considered dishonest acts, instead arguing that Sowinski, Novak, and other HSHS officers' knowledge was not sufficient to constitute "discovery."  As a result, the Court turns to examining what constitutes "discovery."

Discovery occurs "when the insured gains sufficient factual knowledge, not mere suspicion, which would justify a careful and prudent man in charging another with dishonesty." Kinzer, 652 N.E.2d at 28 (citation omitted).  To trigger a provision which terminates coverage of an employee once the insured discovers his or her misconduct, the insured must be "aware of the true nature of the events which have given rise to the allegation." Id.  Such a provision is to be "strictly construed" such that "actual knowledge" is required.  Id.

Arguing that HSHS knew by 2015 that Ogletree was committing dishonest acts, Great American asserts the following: (1) Sowinski's audit of the Free Choice program in 2015 and determination that Ogletree had purposefully inflated data; (2) Sowinski's testimony that "[Ogletree] wasn't honest; he was misrepresenting the truth to the board,"  d/e 34, p. 28; (3) Sowinski's conclusions being provided to Novak, Cottrell, Marquardt, and the Board in 2015; and (4) Sowinski and Novak finding that Ogletree had lied about his involvement in setting an excessive rate for Free Choice, and their subsequent

communication of that to Starmann-Harrison, Cottrell, and Marquardt in writing about their findings in 2015 and 2016.

HSHS cites U.S. Fid. & Guar. Co. v. Empire State Bank for the proposition that the alleged knowledge does not meet the level of "discovery" because the insured must not only have knowledge of the facts, but also the significance of those facts, and that the significance of earlier facts cannot be viewed with 20/20 hindsight. 448 F.2d 360, 365 (8th Cir. 1971).  In support of HSHS' argument, HSHS asserts that: (1) Sowinski admitted he lacked any "smoking gun" for his suspicions; (2) that although Sowinski voiced his concerns to certain personnel, Great American has not shown that any other officer, director, or partner shared his suspicions or that they were "aware of the true nature of the events"; and (3) in fact, Cottrell and Starmann-Harrison disagreed with Sowinski.  In response, Great American cites First Sec. Sav. v. Kansas Bankers Sur. Co. for the proposition that while a mere suspicion of loss is not enough to constitute discovery, an insured cannot "disregard known facts."  849 F.2d 345, 350 (8th Cir. 1988).

A reasonable jury could find that the knowledge alleged by Great American did not constitute "discovery."  Whether Sowinski's

determination that Ogletree had purposefully inflated data, as well as his belief that Ogletree was misrepresenting the truth, reflected his awareness of the "true nature of the events" is for a jury to decide.  Kinzer, 652 N.E.2d at 28; see Cent. Nat. Life, 626 F.2d at 541 (denying summary judgment when reasonable persons could disagree on inferences drawn from underlying facts).  A jury may view Sowinski's admittance that he lacked any "smoking gun" as Sowinski having mere suspicions, and not actual knowledge, of Ogletree's dishonest acts.  Although Sowinski's knowledge is imputable to HSHS, as discussed above, his knowledge does not meet the level to constitute "discovery."  Similarly, Cottrell and Starmann-Harrison's disagreement with Sowinski's conclusion is sufficient evidence such that a reasonable jury could find that they were unaware of the "true nature of the events," and that they only had suspicion of Ogletree's dishonest acts.  Kinzer, 652 N.E.2d at 223.  Great American cites Utica Mut. Ins. Co. v. Fireman's Fund Ins. Companies for the proposition that Cottrell had a "duty to inquire" as to Sowinski's report's accuracy.  748 F.2d 118, 122.  However, Utica is distinguishable because there, the "duty to inquire" imposed on the insured stemmed from a New York law.

Id.  Great American does not identify an analogous Illinois law that imposes a similar "duty to inquire" on Cottrell.  Therefore, Defendant's Motion for Summary Judgment is DENIED as to its claim that the 2017-2018 Policy excludes loss caused by Ogletree.

### C. Defendant Great American Is Not Entitled to Summary Judgment on Counts I and II Because Reasonable Persons May Disagree on When HSHS Discovered Ogletree's Theft.

The 2017-2018 Policy provides coverage for the time period between July 1, 2017 and July 1, 2018.  See d/e 34, Ex. 23, p. 3.  Neither party disputes that the loss in question is a type covered by the 2017-2018 Policy; rather, the parties dispute when discovery of the loss occurred.  The loss in question is covered under Insuring Agreement 1, as modified by Endorsement No. 8, which provides that Great American "will pay for loss resulting directly from employee dishonesty."  Id. at p. 5, 10.  "Employee dishonesty" is defined as "only theft by an employee, whether identified or not, acting alone or in collusion with other persons, except you or a partner."  Id. at 10.  "Theft" is defined as "the unlawful taking of money, securities and other property to the deprivation of the Insured."  Id.  If Great American is correct that HSHS discovered the loss no later than January 14, 2017, and

prior to July 1, 2017, when HSHS allegedly assumed collusion between Ogletree and Free Choice existed, then the loss was discovered prior to the 2017-2018 Policy Period.  On the other hand, if HSHS is correct that it discovered the loss (Ogletree's theft) on March 8, 2018, when Ogletree was indicted, then the loss was discovered within the 2017-2018 Policy Period.

If a word is specifically defined in the policy, that meaning controls.  <u>Am. Nat. Fire Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA</u>, 796 N.E.2d 1133, 1141 (Ill. App. 2003).  In applying that principle, "discovery of loss" as defined by the 2017-2018 Policy occurs "when [HSHS] first become[s] aware of facts which would cause a reasonable person to assume that a loss covered by this Policy has been or will be incurred, even though the exact amount or details of the loss may not then be known." d/e 34, Ex. 23, at 6.  The Merriam-Webster Dictionary defines "assume" as "to take as granted or true."  Assume, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/assume (last accessed February 28, 2023).  In evaluating the same discovery definition as the one present here but in the bond context, several courts have found

that discovery occurs not just when the insured gains knowledge of facts, but when the insured also appreciates the importance of those facts.  See Resol. Trust Corp. v. Fid. & Deposit Co. of Md., 205 F.3d 615, 631 (3d Cir. 2000); FDIC. v. Aetna Cas. & Sure. Co., 903 F.2d 1073, 1079 (6th Cir. 1990); U.S. Fid., 448 F.2d at 366. But see Royal Trust Bank, N.A. v. Nat'l Union Fire Ins. Co., 788 F.2d 719, 721 n.2 (11th Cir. 1986) ("[a]ll that is required is that [the bank] have enough information to assume that the employee has acted fraudulently or dishonestly," not to charge the employee with fraud or dishonesty).   The Court notes that these courts evaluated discovery of an employee's fraudulent or dishonest acts, not theft, as is the case here.

Great American argues that HSHS discovered the loss before the 2017-2018 Policy Period because, as of July 1, 2017, HSHS knew the following facts: (1) Ogletree's prior connection to Free Choice; (2) Ogletree's falsification of data to prompt HSHS to approve the Free Choice contract; (3) Ogletree's collusion with Free Choice to set an excessive rate for its services; (4) Ogletree's lie to HSHS about his involvement in setting the excessive rate; (5) Free Choice failure to account for $1,532,609.06 of the $5,161,500 paid

by HSHS; and (6) Ogletree's misleading statements about the number of health insurance policies Free Choice bought to cover up the fact that Free Choice had failed to fulfill its contractual obligations.  Great American also asserts that in early 2016, Sowinski informed Novak, Marquardt, and Starman-Harrison that he believed in "unequivocal and explicit" terms that he believed Ogletree colluded with Free Choice to defraud HSHS.  d/e 34, p. 32.  Great American also points to Novak's "concern[]" in early 2016 that Ogletree priced a "windfall" in the rate paid to Free Choice "in order to set up a fraud."  d/e 34, Ex. A at 83:17-85:16.  Moreover, Great American argues that HSHS had presumed a loss had occurred as of July 1, 2017 because by then, HSHS had engaged a law firm, McDermott, to file a complaint with the Illinois Attorney General and hired a private investigator to research whether "Ogletree ha[s] sufficient assets to cover any judgment a court may award to [HSHS] if it is successful in litigation."  d/e 34, Ex. 39 (1.16.2017 Email).

In response to this argument, HSHS relies on FDIC and U.S. Fid. for the proposition that discovery requires more than suspicion of loss; it requires the insured to appreciate the

significance of those facts.  903 F.2d at 1079; 448 F.2d at 365–66.

In applying this proposition, HSHS points to the following facts: (1) in October 2017, Cottrell had the subjective belief that Ogletree was uninvolved; (2) in December 2016, HSHS' outside counsel advised that an investigation failed to reveal information sufficient to plead fraud with particularity, let alone prove fraud or theft; (3) despite Sowinski's beliefs, there was no evidence of conscious wrongdoing, rather than sloppiness, incompetence, or laziness by Ogletree in assembling the numbers for the Free Choice contract; (4) Ogletree always had explanations, and search of his emails and computer found no "smoking gun"; (5) HSHS made many, ultimately unsuccessful, attempts to uncover the truth about Free Choice; (6) no decision was ever made to investigate Ogletree's assets, and in fact Bulpitt testified to the contrary; and (7) conversations with Investigator Paul Libassi left HSHS with, at most, an understanding that Ogletree was subject to an ongoing criminal investigation that had yet to reach an official conclusion. Instead, HSHS argues that discovery occurred on March 8, 2018, when Ogletree was indicted, and that such a position comports with insurance industry custom and practice.

Both parties cite to cases not applying Illinois law for their propositions, which the Court takes under advisement because of the lack of Illinois case law directly speaking to the issue.  HSHS cites to several cases whose insurance policies did not provide a definition for "discovery of loss," but in applying the principles of law, the courts provided analysis similar to the analysis of the "discovery of loss" definition here.  See Gulf USA Corp. v. Fed. Ins. Co., 259 F.3d 1049, 1059 (9th Cir. 2001) (undefined "discovery of loss" term interpreted to occur "once an insured became aware of facts that would cause a reasonable person to assume a loss had been or would be incurred"); U.S. Fid., 448 F.2d at 364–66 (defining "discovery" to require awareness of the significance of known facts and that suspicion alone does not satisfy the test).

Viewing the facts in the light most favorable to HSHS, the Court finds that a reasonable jury could conclude that a reasonable person would have assumed, based on the information that HSHS knew, that "discovery of the loss" did not occur until March 8, 2018, when Ogletree was indicted.  Here, HSHS possessed knowledge of facts that would cause a reasonable person to be suspicious of Ogletree.  In 2014 and 2015, HSHS

received reports examining Ogletree's personal ties to Free Choice and the excessive rates paid to Free Choice.  Additionally, in June 2015, Novak hired Global Edge to investigate potential conflict of interests between Ogletree and vendors, including Free Choice. Moreover, in late 2015 and early 2016, Novak and Sowinski notified Cottrell, Starmann-Harrison, and Marquardt on multiple occasions of their belief that Ogletree had lied about his involvement in determining the rate paid to Free Choice and that he had committed fraud.  However, the Court notes that these reports were inconclusive as to whether Ogletree was involved and Cottrell did not believe Sowinski.  Furthermore, "discovery of loss" in the 2017-2018 Policy is defined to provide coverage only for "theft."  A reasonable jury may find that this knowledge was insufficient for HSHS to assume that Ogletree engaged in theft instead of a dishonest act.  Rather, a reasonable jury may find that HSHS did not assume Ogletree engaged in theft until his indictment on March 8, 2018.

Great American also points to a January 14, 2017 e-mail, which specifically identified Ogletree in seeking potential damages in a litigation action against Free Choice, in support of its

argument that HSHS discovered the loss prior to the 2017-2018
Policy Period.  See Ex. 30, 31; Ex. 36; Pl.'s Ex. 3 at 59:25-60:5.  By
this time, HSHS had retained McDermott to report Free Choice to
the Illinois Attorney General.  Ex. A at 93:18-24; Ex. F at 64:13-23.
HSHS was concerned that the money paid to Free Choice did not
go to charitable purposes.  Ex. 46.  Moreover, McDermott had
hired a private investigator to find evidence whether ". . . Ogletree
ha[s] sufficient assets to cover any judgment a court may award to
[HSHS] if it is successful in litigation" on HSHS' behalf.   Ex. 59.
Great American also argues that Bulpitt's authorization of an
investigation into Ogletree "destroys any possible inference" that
HSHS did not believe Ogletree was involved in the Free Choice loss.
d/e 34, p. 9.  Great American further argues that although Bulpitt
initially testified that she did not authorize an investigation into
Jeff Ogletree, she later recanted her testimony because she stated
that at the time, HSHS was trying to "investigate Free Choice," and
HSHS "included . . . Ogletree as part of Free Choice."  d/e 44, p.
25; Ex. J at 31:24-34:23.  However, HSHS points out that the
February 28, 2017 Quest Consultants Report, which was the
authorized investigation in question, analyzed only La Porta's

assets, not Ogletree's.  A reasonable juror could look at these disputed facts and interpret them as evidence of suspicion, not evidence of knowledge.

Great American argues that mere suspicion of loss is not enough to constitute discovery, but an insured cannot "disregard known facts." First Sec. Sav., 849 F.2d at 350.  However, a reasonable jury could find that HSHS' subsequent investigations into Ogletree is demonstrative of HSHS *not* "disregard[ing] known facts," but evidence of HSHS trying to confirm or dispel their suspicions.  Id.  Such investigations did not lead to a conclusive result that Ogletree had indeed engaged in theft.  See U.S. Fid., 448 F.2d at 364–66 ("a mere discovery of certain facts which later lead to other facts which reveal the existence of a shortage does not necessarily constitute a discovery.").  Furthermore, while it is true that the exact amount or details of the loss do not have to be known to constitute "discovery of loss" as defined by the 2017-2018 Policy, a reasonable juror could find that HSHS' knowledge merely amounted to suspicion, regardless of whether it had "sufficient facts to plead fraud with particularity" or a "smoking gun" to "place a reasonable employer on notice that Mr. Ogletree

had committed theft." d/e 39, p. 29. By March 8, 2018, when Ogletree was indicted, HSHS does not dispute that it "discover[ed] the loss." d/e 39, p. 13.

Under the circumstances, a reasonable jury may find that a reasonable person would not have assumed that Ogletree was engaging in theft, i.e. unlawfully taking money, until March 8, 2018, when he was indicted. Therefore, Defendant's Motion for Summary Judgment on the grounds that Plaintiff discovered the loss before the 2017-2018 Policy period is DENIED.

### D. Defendant Great American is Not Entitled to Summary Judgment on Counts II and III Because a Reasonable Jury May Find That HSHS Provided Timely Notice.

Condition E.7 of the 2017-2018 Policy requires HSHS to notify Great American "as soon as possible" after the "Risk Management Department and/or Corporate Legal Department and/or Officer discover(s) a loss or a situation that may result in a loss." Ex. 23, at § E.7. Following Illinois law, the Court must "ascertain and give effect to the intentions of the parties as expressed in the policy language" when construing an insurance policy. West Am. Ins. Co. v. Yorkville Nat. Bank, 939 N.E.2d 288,

293 (Ill. 2010).  Where the policy language is unambiguous, the language is given its "plain, ordinary, and popular meaning."  Id.

Notice provisions of insurance agreements, such as the one in this case, "are not merely technical requirements but, rather, conditions precedent to the triggering of the insurer's contractual duties."  Zurich Ins. Co. v. Walsh Contr. Co. of Ill., Inc., 816 N.E.2d 801, 805 (Ill. App. Ct. 2004); see also Yorkville, 939 N.E.2d at 293.  "An insured's breach of a notice clause in an insurance policy by failing to give reasonable notice will defeat the right of the insured to recover under the policy."  Yorkville, 939 N.E.2d at 293. While "the timeliness of an insured's notice to its insurer generally is a question of fact," id., when the material facts are undisputed, "the reasonableness of notice to an insurer by its insured is a question of law."  Montgomery Ward & Co. v. Home Ins. Co., 753 N.E.2d 999, 1004 (Ill. App. Ct. 2001).

"Whether notice has been given within a reasonable time depends on the facts and circumstances of the case."  Yorkville, 939 N.E.2d at 293.  Illinois courts consider five factors to determine whether notice was given "within a reasonable time," including: "(1) the specific language of the policy's notice provision;

(2) the insured's sophistication in commerce and insurance matters; (3) the insured's awareness of an event that may trigger insurance coverage; (4) the insured's diligence in ascertaining whether policy coverage is available; and (5) prejudice to the insurer." <u>Id.</u> (citation omitted).  These factors are viewed together and are not individually determinative.  <u>Farmers Auto Ins. Ass'n v. Burton</u>, 967 N.E.2d 329, 334 (Ill. App. Ct. 2012).

Great American argues that HSHS discovered "a situation that may result in loss" by September 2017 because several individuals covered by Condition E.7 learned in September 2017 that Ogletree was a signatory on Free Choice's bank account and that the funds HSHS paid to Free Choice were used to purchase Ogletree's home.  Great American contends that because HSHS waited approximately seven months before notifying Great American on April 25, 2018, HSHS violated Condition E.7.

In response, HSHS argues that the date of discovery was March 8, 2018, such that notice was timely.  However, HSHS argues that even if discovery took place in September 2017, it reasonably delayed giving notice because Ogletree had been the subject of numerous inconclusive investigations, including a

confidential criminal investigation that led to an indictment in March 2018.  HSHS asserts that it made the "understandable and prudent" decision to await indictment before accusing its employee of a crime.  d/e 39, p. 15.

The Court has previously declined to grant Defendant's Motion for Summary Judgment on the grounds that HSHS discovered Ogletree's theft in September 2017.  As a result, genuine disputes of material fact remain as to when the discovery occurred and the issue is a question for the trier of fact.  <u>See Montgomery</u>, 753 N.E.2d at 1004.  Therefore, Defendants' Motion for Summary Judgment on the grounds that HSHS failed to provide timely notice is DENIED.

### E. Defendant Great American Is Not Entitled to Summary Judgment on Count III.

Under Section 155 of the Illinois Insurance Code, HSHS is entitled to an award of attorney fees and other costs if Great American's actions were "vexatious and unreasonable."  215 ILCS 5/155.  To meet this showing, HSHS must demonstrate that Great American's behavior was "willful and without reasonable cause." <u>Citizens First Nat'l Bank v. Cincinnati Ins. Co.</u>, 200 F.3d 1102,

1110 (7th Cir. 2000).  An insurer's conduct is not vexatious and

unreasonable if:

> there is a bona fide dispute concerning the scope and
> application of insurance coverage; (2) the insurer asserts
> a legitimate policy defense; (3) the claim presents a
> genuine legal or factual issue regarding coverage; or (4)
> the insurer takes a reasonable legal position on an
> unsettled issue of law.

Id.  Whether an insurer's conduct is vexatious and unreasonable is

a question for the Court's determination.  Best v. Owners Ins. Co.,

No. 18-1167-MMM-JEH, 2020 WL 4747876, at *4 (C.D. Ill. Feb.

25, 2020); see Horning Wire Corp. v. Home Indem. Co., 8 F.3d 587,

590 (7th Cir. 1993).  In determining whether an insurer is guilty of

vexatious conduct, the court must consider the totality of

circumstances.  Norman v. Am. Nat'l Fire Ins. Co., 555 N.E.2d

1087, 1110 (Ill. App. Ct. 1990).

Great American seeks summary judgment on Count III of the

Complaint, which alleges that Great American took vexatious and

unreasonable positions on coverage in violation of 215 Ill. Comp.

Stat. Ann. 5/155.  Great American argues that it has "asserted

legitimate defenses and taken reasonable positions regarding the

legal and factual issues in this case."  MSJ, d/e 34, p. 38.  In a

motion for summary judgment, the moving party bears the initial burden of informing the court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.  HSHS contends that Great American's argument fails to meet the summary judgment burden because Great American failed to provide sufficient support in accordance with Federal Rule of Civil Procedure 56(c).  Additionally, HSHS contends that issues of material fact exist, citing to Morrissey's expert opinion, such that summary judgment on Count III is improper.  Morrissey, who previously worked in the crime insurance industry, opines that Great American's denial letter was improper, GAIC "did not conduct a reasonable investigation based on all available information," and that Great American accused HSHS of fraud without conducting a proper investigation.  d/e 39, p. 37.   Great American contends that Morrisey's expert opinion is inadmissible, referring to a motion in limine it intends to file.  The Court does not rule on the admissibility of Morrisey's expert opinion at this time.

Although Great American asserts that the Court "should reject [HSHS'] hyper-technical, nit-picky argument," the Court refuses to make an exception to Federal Rule of Civil Procedure 56(c).  d/e 44, p. 30.  Great American failed to satisfy its initial burden of proof as the movant for summary judgment because it did not cite to specific parts of materials in the summary judgment record.  "If a party fails to properly support an assertion or fact . . . as required by Rule 56(c), the court may . . . give an opportunity to properly support or address the fact . . ."  Fed. R. Civ. Pro. 56(e)(1). Accordingly, the Court will give Great American the opportunity to revise its summary judgment briefing and properly support its assertions of fact.  Therefore, Defendant's Motion for Summary Judgment is DENIED without prejudice.

## VI. CONCLUSION

For the reasons stated, the Motion for Summary Judgment (d/e 32) filed by Defendants Great American Insurance Company is DENIED.  Great American is directed to file a revised summary judgment as to Count III on or before April 7, 2023.  The final pretrial conference scheduled for August 21, 2023, at 2:00 p.m. is to be conducted via video teleconference.  The jury trial currently

scheduled for September 11, 2023, at 9:00 a.m. is reset in location

only to Courtroom II.  All other details remain the same.


**ENTERED: March 24, 2023.**
**FOR THE COURT:**

       _s/Sue E. Myerscough_
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**